IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LOU GARDEN PRICE, SR., | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civ. No. 09-219-SLR |
| | ) | |
| PERRY PHELPS, Warden, | ) | |
| and JOSEPH R. BIDEN, III, | ) | |
| Attorney General of the State | ) | |
| of Delaware, | ) | |
| | ) | |
| Respondents. | ) | |

---

Lou Garden Price.  Pro se petitioner.

Elizabeth R. McFarlan, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware.  Counsel for respondents.

---

**MEMORANDUM OPINION**

September  28 , 2012
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Petitioner Lou Garden Price ("petitioner") is a Delaware inmate in custody at the James T. Vaughn Correctional Center in Wilmington, Delaware.  Presently before the court is petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (D.I. 1; D.I. 21; D.I. 25)  For the reasons that follow, the court will deny his application.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On the morning of April 11, 2001, New Castle County police discovered the body of a young man lying on the side of Adams Dam Road near the intersection with Montchanin Road in Christiana Hundred.  (D.I. 63 at 2)  It was apparent that the man had been shot to death.  A driver's license on the deceased's person indicated that he was Kensworth Griffith of West Chester, Pennsylvania.  Near the body the police found and collected several .45 caliber shell casings and the butt of a cigarette that appeared to have been recently smoked.  *Id.*

Later that morning, shortly before noon, Dr. Sekula-Perlman of the medical examiner's office conducted an autopsy on the victim's body.  She determined that the victim had been shot four times, twice in the back with a .45 caliber weapon, once in the stomach with a .25 caliber weapon, and once in the foot, probably also with a .25 caliber weapon.  Three bullets were recovered from the body, one .45 caliber, one .25 caliber, and one whose caliber could not be determined due to its deformation.  All of the wounds were potentially life threatening and all contributed to the victim's death.  *Id.* at 2-3.

Because the driver's license found on the victim's person indicated he lived in West Chester, the police investigation began there. The investigation eventually led to the arrests of petitioner and Jamel Daniels for Griffith's murder. Petitioner and Daniels were indicted together. However, because they both made statements to the police, their cases were severed, due to potential problems under *Bruton v. United States,* 391 U.S. 123 (1968). *Id.*

Evidence uncovered by the police during the course of their investigation indicated that petitioner ran a drug distribution ring and that Daniels was his "right-hand" man. Griffith sold drugs for petitioner and owed him money, a fact that did not sit well with petitioner. State's witness Faye Markel was a friend of petitioner and acquainted with the victim. About a week before the murder, she went to a 7-11 convenience store to meet petitioner. She knew petitioner was a drug dealer. After she got in petitioner's car, Griffith, Griffith's friend Lance Burton, and another unidentified individual approached the car. Petitioner, in a loud, angry voice, demanded that Griffith pay him the money he was owed. Griffith gave petitioner $60, which was all the money Griffith had with him. Petitioner took the money and drove off, telling Markel that Griffith owed him "serious money" for drugs and warning her not to ask any questions. *Id.* at 3.

Griffith's friend Lance Burton, who also witnessed this incident, testified that Griffith took steps to avoid petitioner on account of the debt and that after the incident at the 7-11 convenience store, Griffith appeared in shock. Petitioner also demanded that Griffith return his calls when paged. *Id.*

2

Burton was also with Griffith, playing basketball, the night of the murder. He testified that Griffith received a page from petitioner while they were at the basketball courts. Burton warned Griffith not to meet petitioner unless he had the money to pay off the debt. Griffith then left. Burton tried to page his friend later that evening, starting at about 10 p.m., using a special code number to identify himself. He testified that Griffith always returned his pages within 15 minutes. On this night, however, Griffith never called back. *Id.* at 3-4.

State witness Lawrence Butcher knew both petitioner and Daniels through their drug activities. He testified that petitioner and Daniels were very close and almost like twins. Daniels stayed in Butcher's apartment for several months in early 2001. During that time, petitioner would often drop by. Butcher testified that petitioner had two handguns, a small .25 caliber pearl-handled Derringer that petitioner stored for a time in a safe in Butcher's apartment, and a large, black Glock that he carried with him always, tucked into the back of his pants. *Id.* at 4.

Exactly what happened on the evening of April 10, 2001, culminating in Kensworth Griffith's murder, was provided by the testimony of Jose Martinez and Jamik Mosley, two individuals from New York who were underlings in petitioner's drug ring. They testified that on April 10, they were living in the Extended Stay Motel near West Chester. On that date, they accompanied petitioner and Daniels first to a dentist, where petitioner received treatment, then to Coatesville, where petitioner met with a girlfriend, and then back to the West Chester area, where Price telephoned someone named "Kenny" and had a conversation about a debt "Kenny" apparently owed petitioner.

3

Approximately 15 minutes later, an individual (Griffith) appeared in the parking lot of the establishment (either a bar or a gas station ) and got into the car with petitioner, Daniels, Martinez, and Mosley.  According to Mosley, petitioner told Griffith that he was going to supply Griffith with more drugs (crack cocaine) to sell, provided Griffith turn over all the profit to petitioner to discharge the debt.  In order to obtain the drugs, however, they would have to drive to Delaware where petitioner had a "big house in the suburbs."  *Id.* at 4-5.

Petitioner drove south on Route 202 from West Chester into Delaware and then turned off onto back roads, eventually pulling off to the side of one of these roads, saying he did not want to park in front of his house.  The area was not lighted, but petitioner left the headlights on.  He and Daniels got out of the car and "acted like they were urinating.  They then returned to the car and told the kid (Griffith), who was sitting in the back seat with Martinez and Mosley, to get out.  Griffith did so.  As soon as he did, petitioner pulled out a little gun with two barrels and shot him.  Daniels then shot him (Griffith) up with another handgun, firing several times.  Petitioner and Daniels then rushed back to the car, and petitioner drove off "real fast," warning Martinez and Mosley (who were, at this point, terrified) not to say anything about what they had witnessed or suffer the consequences.  They then returned to the motel near West Chester.  *Id.* at 5.

The four planned to leave West Chester and go to New York the following day (April 11, 2001).  They packed their belongings into the car and were headed out of West Chester when petitioner received a telephone call regarding a drug transaction.  Petitioner stopped off at a shopping center, went to a car parked nearby, and then

4

returned to his car. Immediately, the four were arrested for drug offenses, the drug transaction being a police "sting" operation, part of an ongoing investigation into petitioner's drug dealing activities. By this time, the Delaware police had already developed petitioner as a primary suspect in Griffith's murder. Once Martinez and Mosley agreed to cooperate with the police and told their stories, both petitioner and Daniels were charged with first degree murder and possession of a firearm during the commission of a felony. *Id.* at 5-6.

In April 2003, a Delaware Superior Court jury found petitioner guilty of both offenses. *Id.* at 1. After a two-day penalty hearing, the jury could not unanimously find either of the alleged statutory aggravators and, therefore, did not engage in the weighing of aggravating and mitigating circumstances. The Superior Court judge sentenced petitioner to life imprisonment for the murder conviction, and twenty years for the weapons offense. *Id.* Petitioner appealed, and the Delaware Supreme Court affirmed petitioner's convictions and sentence. *See Price v. State*, 858 A.2d 930 (Del. 2004).

Petitioner filed a motion for post-conviction relief pursuant to Delaware Superior Court Criminal Rule 61 ("Rule 61 motion"), which was denied. *See State v. Price*, Cr. ID No. 0106010693, Letter Order (Del. Super. Oct. 26, 2006). Petitioner appealed, and the Delaware Supreme Court remanded the case for expansion of the record to include defense counsel's affidavit in response to allegations of ineffective assistance of counsel. (D.I. 28, Order at A12) After receiving and considering counsel's affidavit and supplemental affidavit, the Superior Court affirmed its earlier denial of relief. (D.I. 53,

5

Supplemental Findings Following Order of Remand, No. 610,2006 (Del. Super. Dec. 19, 2008) The Delaware Supreme Court then affirmed the Superior Court's denial of petitioner's Rule 61 motion. *Price v. State*, 30 A.3d 782 (Table), 2009 WL 790357 (Del. Mar. 26, 2009).

Petitioner timely filed a § 2254 application in this court, and then filed an amended application. (D.I. 1; D.I. 21; D.I. 25) The State filed an answer (D.I. 63), arguing that the application does not warrant habeas relief.

## III. GOVERNING LEGAL PRINCIPLES

### A. Exhaustion and Procedural Default

A federal court may consider a habeas petition filed by a state prisoner only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). One prerequisite to federal habeas review is that a petitioner must exhaust all remedies available in the state courts. *See* 28 U.S.C. § 2254(b)(1). The exhaustion requirement is grounded on principles of comity to ensure that state courts have the initial opportunity to review federal constitutional challenges to state convictions. *Werts v. Vaughn,* 228 F.3d 178, 192 (3d Cir. 2000). A petitioner satisfies the exhaustion requirement by "fairly presenting" the substance of the federal habeas claim to the state's highest court, either on direct appeal or in a post-conviction proceeding, and in a procedural manner permitting the state courts to consider it on the merits. *See Duncan v. Henry*, 513 U.S. 364, 365 (1995); *Castille v. Peoples*, 489 U.S. 346, 351 (1989); *Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997).

6

A petitioner's failure to exhaust state remedies will be excused if state procedural rules preclude him from seeking further relief in state courts. *Lines v. Larkins,* 208 F.3d 153, 160 (3d Cir. 2000); *see Teague v. Lane,* 489 U.S. 288, 297-98 (1989). Although treated as technically exhausted, such claims are nonetheless procedurally defaulted. *Lines,* 208 F.3d at 160; *Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991). Similarly, if a petitioner presents a habeas claim to the state's highest court, but that court "clearly and expressly" refuses to review the merits of the claim due to an independent and adequate state procedural rule, the claim is exhausted but procedurally defaulted. *See Coleman*, 501 U.S. at 750*; Harris v. Reed*, 489 U.S. 255, 260-64 (1989).

A federal court cannot review the merits of procedurally defaulted claims unless the petitioner demonstrates either cause for the procedural default and actual prejudice resulting therefrom, or that a fundamental miscarriage of justice will result if the court does not review the claims. *McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir. 1999); *Coleman v*, 501 U.S. at 750-51. To demonstrate cause for a procedural default, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate actual prejudice, a petitioner must show that the errors during his trial created more than a possibility of prejudice; he must show that the errors worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494.

Alternatively, if a petitioner demonstrates that a "constitutional violation has probably resulted in the conviction of one who is actually innocent," *Murray*, 477 U.S. at

7

496, then a federal court can excuse the procedural default and review the claim in order to prevent a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Wenger v. Frank*, 266 F.3d 218, 224 (3d Cir. 2001). The miscarriage of justice exception applies only in extraordinary cases, and actual innocence means factual innocence, not legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623 (1998); *Murray*, 477 U.S. at 496. A petitioner establishes actual innocence by asserting "new reliable evidence - -whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - - that was not presented at trial," showing that no reasonable juror would have voted to find the petitioner guilty beyond a reasonable doubt. *Hubbard v. Pinchak*, 378 F.3d 333, 339-40 (3d Cir. 2004).

## B. Standard of Review

If a state's highest court adjudicated a federal habeas claim on the merits, the federal court must review the claim under the deferential standard contained in 28 U.S.C. § 2254(d). Pursuant to 28 U.S.C. § 2254(d), federal habeas relief may only be granted if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or the state court's decision was an unreasonable determination of the facts based on the evidence adduced in the trial. 28 U.S.C. § 2254(d)(1) & (2); *see also Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). A claim has been "adjudicated on the merits" for the purposes of 28 U.S.C. § 2254(d) if the state court decision finally resolves the claim on the basis of its substance, rather than on a procedural or some other ground. *Thomas v. Horn*, 570

F.3d 105, 115 (3d Cir. 2009). The deferential standard of § 2254(d) applies even "when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied"; as recently explained by the Supreme Court, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, __ U.S. __, 131 S.Ct. 770, 784-85 (2011).

When reviewing a habeas claim, a federal court must presume that the state court's determinations of factual issues are correct. 28 U.S.C. § 2254(e)(1). This presumption of correctness applies to both explicit and implicit findings of fact, and is only rebutted by clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir. 2000); *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003)(stating that the clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas the unreasonable application standard of § 2254(d)(2) applies to factual decisions).

## IV. DISCUSSION

Petitioner's amended application presents the following eight grounds for relief:[1] (1) ineffective assistance of counsel for failing to request a continuance to prepare for trial and failing to conduct an independent investigation; (2) illegal search of the hotel room and ineffective assistance of counsel for failing to file a motion to suppress on that basis; (3) illegal search of his vehicle and ineffective assistance of counsel for failing to

---

[1] The State discusses nine grounds for relief in its Answer. However, during the pendency of this proceeding, petitioner asked to waive ground eight that was asserted in his original application (perjury by the State's DNA expert) and replace it with a cumulative error claim. (D.I. 24 (letter requesting amendment); D.I. 25 (amended application)) Therefore, the court will not review the waived perjury claim.

9

file a motion to suppress on that basis; (4) ineffective assistance of counsel for failing to raise a *Massiah* claim and for failing to argue that consciousness of guilt evidence violates due process; (5) prosecutorial misconduct for mentioning accomplice liability during closing argument; (6) constructive amendment of the indictment; (7) violation of petitioner's due process rights as a result of the Delaware state courts' summary dismissal of his Rule 61 proceeding; and (8) the cumulative effect of all of these errors requires relief.

### A. Claims Two and Three: Fourth Amendment Violations

In claim two, petitioner asserts that the search of his hotel room by New Castle County police was illegal and that counsel was ineffective for failing to move to suppress the evidence seized from the room. In claim three, petitioner complains that the search of his leased Chevy Malibu by New Castle County police was illegal and that counsel was ineffective for failing to file a motion to suppress the evidence seized from the car. Petitioner's contentions regarding the illegal search and seizure of evidence assert Fourth Amendment violations. For ease of analysis, the court will address the Fourth Amendment claims separately from the corresponding ineffective assistance of counsel claims.

The State properly argues that petitioner's Fourth Amendment claims are not cognizable on federal habeas review under the doctrine established in *Stone v. Powell*, 428 U.S. 465, 494 (1976). In *Stone*, the Supreme Court held that federal courts cannot provide habeas review of Fourth Amendment claims if the petitioner had a full and fair opportunity to litigate Fourth Amendment claims in the state courts. *Id.*; *See Wright v.*

*West*, 505 U.S. 277, 293 (1992)("We have also held . . . that claims under *Mapp* [alleging evidence obtained in violation of the Fourth Amendment] are not cognizable on habeas as long as the courts have provided a full and fair opportunity to litigate them at trial or on direct review."). A petitioner has had a full and fair opportunity to litigate such claims if the state has an available mechanism for suppressing evidence seized in or tainted by an illegal search or seizure, irrespective of whether the petitioner actually availed himself of that mechanism. *See U.S. ex rel. Hickey v. Jeffes*, 571 F.2d 762, 766 (3d Cir. 1978); *Boyd v. Mintz*, 631 F.2d 247, 250 (3d Cir. 1980); *Petillo v. New Jersey*, 562 F.2d 903, 906-07 (3d Cir. 1977). Conversely, a petitioner has not had a full and fair opportunity to litigate a Fourth Amendment claim and, therefore, avoids the *Stone* bar, if the state system contains a structural defect that prevented the state from fully and fairly hearing his Fourth Amendment claims. *Marshall v. Hendricks*, 307 F.3d 36, 82 (3d Cir. 2002).

Here, although petitioner's counsel did not file a motion to suppress the evidence seized from the hotel room or his car, the fact that Delaware provides a mechanism for such suppression via Delaware Superior Court Criminal Rule 41 satisfies the "full and fair opportunity to litigate" requirement for federal habeas purposes. *See, e.g., Marshall*, 307 F.3d at 82 (holding that "[a]n erroneous or summary resolution by a state court of a Fourth Amendment claim does not overcome the [*Stone*] bar."); *Gilmore v. Marks*, 799 F.2d 51, 56 (3d Cir. 1986). Accordingly, the court will deny the Fourth Amendment arguments asserted in claims two and three as barred by *Stone*.

### B. Claims One, Two, Three, Four: Ineffective Assistance of Counsel

Petitioner presented the ineffective assistance of counsel arguments asserted in claims one, two, three, and four of this proceeding to the Delaware Supreme Court on post-conviction appeal. The Delaware Supreme Court rejected the arguments and summarily affirmed the Superior Court's denial of the claims "on the basis of and for the reasons by the Superior Court in its decision after remand dated December 19, 2008." *Price v. State*, No.610,2006, Order (Del. Mar. 26, 2009). Thus, petitioner will only be entitled to habeas relief if the Delaware Supreme Court's denial of claims one, two, three, and four was contrary to, or an unreasonable application of, clearly established federal law.

The clearly established federal law governing ineffective assistance of counsel claims is the two-pronged standard announced in *Strickland v. Washington*, 466 U.S. 668, 690 (1984). Under the first *Strickland* prong, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness," with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance. *Strickland*, 466 U.S. at 688. The second *Strickland* prong requires a petitioner to demonstrate "there is a reasonable probability that, but for counsel's error the result would have been different." *Id.* at 687-96. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.* at 688. In order to sustain an ineffective assistance of counsel claim, a petitioner must make concrete allegations of actual prejudice and substantiate them or risk summary dismissal. *See Wells v. Petsock*, 941 F.2d 253, 259-60 (3d Cir. 1991); *Dooley v.*

12

*Petsock*, 816 F.2d 885, 891-92 (3d Cir. 1987). Although not insurmountable, the *Strickland* standard is highly demanding and leads to a "strong presumption that the representation was professionally reasonable." *Strickland*, 466 U.S. at 689.

Notably, a court must apply a doubly deferential standard of review when analyzing an ineffective assistance of counsel claim under § 2254(d)(1). "The pivotal question is whether the state court's application of the *Strickland* was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* at 788. As a result, when assessing prejudice under *Strickland*, a court must determine if petitioner has shown "a substantial, not just conceivable" likelihood that the outcome of the case would have been different if counsel had performed otherwise. *Id.* at 792. Thus, when viewing a state court's determination that a *Strickland* claim lacks merit through the lens of § 2254(d), federal habeas relief is precluded "so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* at 786.

In this case, the Delaware state courts denied the instant ineffective assistance of counsel allegations after correctly identifying the *Strickland* standard. Therefore, the court concludes that the Delaware Supreme Court's denial of claim one was not contrary to *Strickland*. *See Williams*, 529 U.S. at 406 ("[A] run-of-the-mill state-court

13

decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause").

The court's inquiry is not over, however, because it must also determine if the Delaware state court decisions warrant relief under the "unreasonableness" prong of the § 2254(d)(1) test.  The court will review petitioner's ineffective assistance allegations under the pertinent "doubly deferential" standard in seriatim.

### 1. Claim One:  Mr. Bernstein's late appointment and failure to prepare

In September 2001, the Superior Court appointed two attorneys to represent petitioner.  Trial was scheduled for October 2002.  However, in September 2002, the President Judge of the Superior Court issued an Administrative Directive temporarily staying all trials in capital cases.  The stay was lifted in January 2003.  On February 4, 2003, John Deckers, one of petitioner's appointed counsel, moved to withdraw as counsel.  The Superior Court granted the motion on February 25, 2003, and the court appointed new counsel, Joseph Bernstein, the same day.  Petitioner's other counsel, Andrew Witherell, continued to represent petitioner along with Mr. Bernstein.  Jury selection began on April 8, and the trial began on April 15.  The jury convicted petitioner of first degree intentional murder and possession of a firearm during the commission of a felony.  Petitioner's two defense attorneys represented him during his direct appeal. The Delaware Supreme Court affirmed his convictions and sentence.

Thereafter, acting pro se, petitioner filed a Rule 61 motion asserting, inter alia, several ineffective assistance of counsel allegations.  The Superior Court denied the

motion, and petitioner appealed. In an order dated February 27, 2008, the Delaware

Supreme Court remanded the case to the Superior Court, stating that

> [i]t appears that the Superior Court neither requested **counsel's response** nor
> conducted a hearing on [petitioner's] claims of ineffective assistance of counsel.
> Having reviewed the record and the parties' position on appeal, the Court has
> concluded that this case must be remanded to the Superior Court for expansion
> of the record to include **counsel's affidavit** in response to [petitioner's]
> allegations of ineffective assistance of counsel and an evidentiary hearing
> thereon, if necessary.

(D.I. 28 at A12)(emphasis added) On remand, the Superior Court ordered Mr. Bernstein

to file a Rule 61 affidavit, and then ordered him to file a supplemental affidavit. When

returned on appeal, petitioner only challenged Mr. Bernstein's performance, the State

only discussed Mr. Bernstein's performance, and the Delaware Supreme Court

thoroughly reviewed Mr. Bernstein's affidavits without any reference to Mr. Witherell.

After viewing this record in conjunction with petitioner's presentation of his ineffective

assistance of counsel claims in this proceeding, the court views all petitioner's

ineffective assistance of counsel claims as only alleging ineffective assistance on the

part of Mr. Bernstein.

With respect to petitioner's complaint about Mr. Bernstein's late appointment, the

Delaware Superior Court rejected petitioner's argument because he failed to

demonstrate any prejudice stemming from such late appointment. The Superior Court

noted that Mr. Bernstein had six weeks to prepare, and petitioner's other attorney, Mr.

Witherell, had been representing petitioner for 18 months and was available to assist

Mr. Bernstein in preparing for trial. The Superior Court also specifically explained that

petitioner failed to describe "any specific instances where Mr. Bernstein's conduct was

lacking as a result of his late entry into the litigation." (D.I. 53, Supplemental Findings Following Order of Remand, No.610,2006, at 18-10 (Del. Super. Dec. 19, 2008))

The court concludes that the Delaware state courts reasonably applied *Strickland* in denying petitioner's argument for failure to establish prejudice. Even in this proceeding, petitioner does not specifically explain how anything would have been different if Mr. Bernstein had more time to prepare. *See Jackson v. Carroll*, 161 Fed. App'x 190, 193 (3d Cir. Dec. 20, 2005). For instance, although petitioner contends that Mr. Bernstein did not properly prepare for trial because he did not conduct an independent investigation due to his late appointment, petitioner fails to address the fact that Mr. Bernstein was acting as co-counsel with Mr. Witherell. Mr. Witherell had been representing petitioner for 18 months and, therefore, was able to share his knowledge with Mr. Bernstein. Additionally, as explained in his Rule 61 affidavit, Mr. Bernstein independently reviewed the defense and prosecution files, and "determined that any possibly fruitful areas of investigation had already been undertaken." (D.I. 53, State's Ans. Supp. Mem. in *Price v. State*, No.610,2006, Ex. C, Affid. of John Bernstein, at 3) To the extent petitioner points to Mr. Bernstein's failure to interview or investigate Detective Lee as an example of Mr. Bernstein's lack of preparation, Mr. Bernstein explained that

> [i]n this case, after [petitioner] was arrested, the police obtained warrants to monitor [petitioner's] phone calls and conversations with visitors who saw him in jail. As a result, the police learned that two of [petitioner's] girlfriends, Lacoya Coleman ("Coleman") and Markeeta Turner ("Turner") were assisting [petitioner]. After he was arrested, [petitioner] sent a letter to Turner. In the letter, [petitioner] told Turner that he was in the motel room the night Griffith was shot, but did not have anybody to corroborate his story. [Petitioner] asked Turner if she would recant her earlier statement to the police that she was not with him that night. [Petitioner]

**16**

also asked Turner to go with Coleman to the Extended Stay Motel to meet with a janitor at the hotel who would say that he brought towels to the room and saw [petitioner].  Detective Lee's role in the case was to pose as the "janitor" who would provide an alibi for [petitioner]. [Petitioner ] also told her that the janitor would be paid $1,000 to back up [petitioner's] story.  The conversations between Turner and the "janitor" were tape recorded and Turner was subsequently arrested and charged with criminal solicitation and conspiracy.

The State chose not to call Det. Lee as a witness at trial, presumably due to his "credibility" issues.  However, at trial, Turner and Coleman both testified for the State concerning the alleged alibi and the attempt to bribe the "janitor."  The taped conversation between Turner and the "janitor" thus became admissible and was heard by the jury.  At that point, the credibility of Det. Lee was no longer an issue and I made a decision not to call Det. Lee as a witness at trial.

*Id.* at 3-4.  This explanation demonstrates that Mr. Bernstein was fully aware of the issues concerning Detective Lee, and that his decision not to call Lee as a witness was strategic in nature, rather than the result of inadequate investigation and/or inadequate preparation.

Given this record, the court concludes that the trial judge's specific finding that "Mr. Bernstein was, in fact, prepared and represented [petitioner] to the best of his considerable ability and against substantial evidence of [petitioner's] guilt," was based on a reasonable determination of facts. (D.I. 53, Supplemental Findings, at 18-19)  In turn, the court concludes that the Delaware Supreme Court reasonably applied *Strickland* in affirming the Superior Court's decision.  Accordingly, the court will deny claim one.

### 2. Claim Two: Failure to file motion to suppress hotel room evidence

In claim two, petitioner contends that counsel provided ineffective assistance by failing to file a motion to suppress the evidence seized from the hotel room.  The

Superior Court rejected this claim after determining that petitioner did not demonstrate prejudice under *Strickland.* Specifically, the Superior Court noted that petitioner did not specify what evidence was found in the hotel room and how that evidence was used against him at trial. Rather, he simply alleged that the search resulted in "fruits from the poisonous tree."

In this proceeding, petitioner again fails to identify any evidence that was seized from the hotel room and used against him at trial. Thus, viewing the instant claim through the doubly deferential habeas lens applicable to ineffective assistance of counsel claims raised in habeas proceedings, the court concludes that claim two does not warrant relief.

### 3. Claim Three: Failure to file motion to suppress evidence retrieved from the Chevy Malibu

On April 11, 2001, Delaware police recovered a fresh cigarette butt from the murder scene. Later that same day, petitioner and the others were arrested in Pennsylvania on drug charges. At the time of his arrest, petitioner was driving a blue Chevy Malibu. The Pennsylvania police impounded the Chevy Malibu. The Delaware police had the Malibu towed to Delaware sometime in the early evening on April 11, 2001.

The New Castle County police started to process the evidence from the car on April 12, 2001, and continued to do so over the course of the following week. The police found several cigarette butts in the ashtray located in the car's center console and on the car's floor areas. The police turned the cigarette butts from the car and the butt from the murder scene over to the Medical Examiner's Office for DNA analysis.

18

DNA was extracted from the cigarette butts and the resulting DNA profile was compared with the known DNA profiles of petitioner and Daniels.  The results of the comparison were that the cigarette butt found at the murder scene contained a mixture of the DNA from petitioner and Daniels; one of the cigarette butts found in the car's ashtray was consistent with petitioner's DNA profile; seven of the ashtray butts were consistent with Daniel's DNA profile, and two of the butts contained a mixture of Daniel's and petitioner's DNA.

In claim three, petitioner contends that counsel was ineffective for failing to move to suppress the evidence seized from the Chevy Malibu, namely, the cigarette butts that were found in the Malibu's ashtray, as well as "incense stick stains, finger prints, fibers, etc." (D.I. 25 at 37)  According to petitioner, the "cigarette butt was the only physical evidence that linked [him] to the crime scene" and, therefore, "all evidence found in the car and fruits of that evidence . . . should [have been] excluded [] because, if not for the issuance of the blood warrant [i.e., the warrant permitting the Pennsylvania police to collect samples of petitioner's blood for DNA testing], then the cigarette butt found at the crime scene could not have been used against petitioner at trial." *Id*. at 37.  The Superior Court denied this argument, and petitioner asserts several arguments challenging that decision.  First, he contends that the Superior Court's denial was premised on Mr. Bernstein's erroneous assertion in his Rule 61 affidavit that petitioner's former attorney, Mr. Deckers, had filed a suppression motion, but later withdrew it after an office conference.  Second, he asserts that, "contrary to the unreasonable determination made by the Superior Court (that a viable basis for suppression did not

19

exist), the DNA evidence was clearly one of the State's titans." *Id.* And finally, petitioner contends that the forensic search of the vehicle performed by the New Castle County police was performed more than two months after his arrest by the Pennsylvania authorities and, therefore, did not constitute a search incident to a lawful arrest.

Turning first to petitioner's specific allegations of the "factual" errors underlying the Delaware state court decisions, the court notes that the Delaware Supreme Court was aware of Mr. Bernstein's erroneous belief that Mr. Deckers had filed and withdrawn a suppression motion when it affirmed the Superior Court's denial of the instant claim, as demonstrated by the fact that the State's Answering Supplemental Memorandum on post-conviction appeal clearly discusses Mr. Bernstein's mistake. Second, the Superior Court's conclusion that petitioner failed to establish that the crime scene cigarette butt was a necessary part of the State's case against him is supported by the fact that two eyewitnesses testified to seeing petitioner shoot Griffiths. In other words, while the DNA evidence from the cigarette butt found at the murder scene corroborated petitioner's presence, there was more than sufficient other evidence upon which to find him guilty. And finally, petitioner incorrectly asserts that the search of the vehicle occurred two months after his arrest. The record clearly shows that the vehicle was impounded on April 11, 2001,the same day petitioner was arrested. The Malibu was turned over to the NCCPD on April 11, 2001 and towed to Delaware. The police started processing the evidence from the vehicle on April 12, 2001, and continued to do so over the course of the following week.

After viewing petitioner's instant claim in context with the foregoing factual explanations, the court further concludes that the Delaware state courts' rejection of the claim was based on a reasonable determination of the facts, and also involved a reasonable application of *Strickland*. Notably, although the Superior Court presumed there was some legal basis for filing a suppression motion, it denied petitioner's allegation of ineffective assistance because it determined that petitioner's vague and conclusory allegations failed to demonstrate prejudice stemming from counsel's failure to file a suppression motion. (D.I. 53, Supplemental Findings, at 5-6)  As previously mentioned, the Superior Court found that petitioner failed to demonstrate that the outcome of his trial would have been different but for counsel's failure to file a motion to suppress the cigarette butt that was recovered from the scene, because "[n]othing in his [Rule 61] motion suggest[ed] that this was a necessary or even important part of the State's case against him." *Id*. Petitioner attempts to rebut this finding by arguing that the discovery of the cigarette butts in the Malibu led prosecutors to have the cigarette butt from the murder scene tested for a DNA match with petitioner and Daniels.  This contention, however, is not supported by anything in the record.  In fact, when Officer DiNardo testified about his role in investigating the crime scene, he stated that he "knew from [his] training and experience that it was possible to get DNA from a cigarette butt. So we submitted [the cigarette butt from the crime scene] to the Medical Examiner's office to see if we could develop a profile." (D.I. 65, Tr. Trans. 4/15/2003, at 33) According to Officer DiNardo, he collected the butt from the crime scene in the morning of April 11, 2001, and began processing the evidence from the Malibu the next day, on

21

April 12, 2001. (D.I. 65, Tr. Trans. 4/21/2003, at 16) Nothing in DiNardo's testimony suggests that the decision to submit the crime scene cigarette butt for DNA testing was due to his retrieval of the cigarette butts from the Malibu. Thus, while the cigarette butt found at the crime scene was certainly an important aspect of the State's case, petitioner has not established a link between the search of the vehicle and the DNA evidence from the cigarette butt at the scene. Petitioner's conjecture regarding such a link is insufficient to demonstrate prejudice under *Strickland*.

And finally, to the extent petitioner believes that the time lapse between his arrest and Officer DiNardo's "processing" or inventory search of the car[2] rendered the warrantless search of the Chevy Malibu illegal, he is mistaken. Under the automobile exception to the warrant requirement, law enforcement officials may lawfully search any area of a vehicle in which they have probable cause to believe that evidence of criminal activity will be found. *See Arizona v. Gant*, 556 U.S. 332, 247 (2009). If probable cause to believe a vehicle contains contraband or other seizable items existed at the time the vehicle is seized and impounded, a delayed warrantless search is no less valid than if searched at the time of seizure. *See United Sates v. Johns*, 469 U.S. 478 (1985). Moreover, once a vehicle is impounded, law enforcement officers can conduct an inventory search of a vehicle without a warrant or any level of suspicion that a car contains contraband. *Colorado v. Bertine*, 479 U.S. 367, 373 (1987).

Given the absence of any suggestion to the contrary, the court presumes that Officer DiNardo conducted his inventory search of the Malibu according to standardized

---

[2] The term "inventory" was used contemporaneously with the term "processing" during the State's direct examination of Officer DiNardo at trial. (D.I. 65, Tr. Trans. 4/17/2003, at 139)

criteria or established routine. *See United States v. Mundy*, 621 F.3d 283, 287-88 (3d Cir. 2010). Consequently, when viewed within the framework established by the foregoing precedent, the one day delay between petitioner's arrest and Officer DiNardo's inventory search of the Malibu did not render the warrantless search of the car illegal. Thus, petitioner cannot demonstrate any prejudice stemming from counsel's failure to file a suppression motion with respect to the evidence seized from the Malibu.

Accordingly, the court will deny the instant ineffective assistance of counsel argument asserted in claim three.

### 4. Claim Four(a): Ineffective assistance regarding *Massiah* issue

William Carr was an inmate in the same Pennsylvania prison where petitioner was incarcerated after his arrest in 2001. Carr wrote a letter dated June 24, 2001, to Chester County officials indicating that he had information that petitioner was attempting to solicit Turner (one of petitioner's girlfriends) to provide a false alibi for him (petitioner). Specifically, petitioner was attempting to have Turner establish an alibi for him by having her recant her initial statement to police and contend that she was with petitioner at the Extended Stay Motel during the night of Griffith's murder. Police acted on Carr's information and obtained court orders to tape Turner's visits and telephone calls with petitioner, as well as petitioner's prison visits and conversations with his other girlfriend, Coleman. Police also intercepted some of the numerous letters petitioner wrote to Turner and Coleman. During this same time-frame, petitioner asked Coleman to assist in obtaining Turner's statement, as well as a statement from a maintenance man (actually an undercover policeman, Detective Lee) corroborating petitioner's alibi that he

23

was at the hotel the night of Griffith's murder.  After petitioner made this request of her, Coleman agreed to cooperate with police in investigating petitioner's attempt to manufacture an alibi.  According to Coleman, she was only expected to listen and see what happened during Turner's meeting with the maintenance man.

Although Coleman was cooperating with police in this investigation, Turner was not cooperating with the police.  In fact, Turner did not know that her conversations with petitioner and her conversations with the "maintenance man" were being recorded.

The State initially intended to call Carr, Detective Lee, Turner, and Coleman as witnesses.  On April 7, 2003, Mr. Bernstein filed a motion to suppress the following evidence pursuant to *Massiah v. United States*, 377 U.S. 201 (1964) ("*Massiah* motion"): (1) all evidence concerning conversations between petitioner and William Carr which occurred on or after June 28, 2001, and any evidence obtained which was the "fruit" of any such conversations; (2) all evidence concerning conversations between petitioner and Detective Arthur Lee of the New Castle County Police Department which occurred on or after June 18, 2001, and any evidence obtained which was the fruit of any such conversations; and (3) all evidence concerning conversations between petitioner and Lacoya Coleman which occurred on or after July 9, 2001, and any evidence obtained which was the fruit of any such conversations; and (4) all evidence concerning conversations between petitioner and Markeeta Turner which occurred after the date (presently unknown) on which Markeeta Turner agreed to cooperate with the State in the prosecution of petitioner.  (D.I. 53, App. to State's Ans. Br. in *Price v. State*,

No.610,2006 at B2) After the filing of this motion, the State decided not to call Carr and Detective Lee as witnesses. Turner and Coleman did testify at petitioner's trial.

According to *Massiah*, once an adversarial proceeding has been initiated against the accused, and the constitutional right to the assistance of counsel has attached, any incriminating statement the government deliberately elicited from the accused in the absence of counsel is inadmissible at trial against that defendant. *Massiah*, 377 U.S. 201. There are three basic requirements for establishing a *Massiah* claim: (1) the Sixth Amendment right to counsel must have attached at the time of the alleged infringement; (2) the informant must have been acting as a "government agent;" and (3) the informant must have engaged in the "deliberate elicitation" of incriminating information from the defendant. *See, e.g.*, *Matteo v. Sup't, SCI Albion*, 171 F.3d 877, 892 (3d Cir. 1999). A defendant's Sixth Amendment right to counsel attaches "only after the initiation of adversary judicial proceedings against a defendant." *United States v. Gouveia*, 467 U.S. 180, 187 (1984). Such proceedings include "formal charge, preliminary hearing, indictment, information or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 689 (1972).

In his fourth allegation of ineffective assistance, petitioner contends that counsel's failure to pursue and litigate the *Massiah* motion violated his Sixth Amendment rights because it resulted in the erroneous admissions of "the fruits" of his jailhouse conversations with Carr, Turner, and Coleman. The Delaware state courts rejected this argument, concluding that petitioner was not prejudiced by counsel's action because counsel reasonably concluded that the *Massiah* motion had become moot once the State decided not to use the challenged conversations at trial.

25

To begin, considering that Carr never testified at trial, the Delaware state courts reasonably determined that the portion of the *Massiah* motion concerning Carr had become moot. In turn, petitioner cannot demonstrate prejudice resulting from counsel's failure to pursue a moot *Massiah* motion. Thus, this portion of claim four does not warrant relief. *See United States v. Carvajal-Garcia*, 54 F. App'x 732, 2002 WL 31667659 (3d Cir. 2002).

However, given that Turner and Coleman actually did testify at trial, the court is not persuaded by the Delaware state courts' "mootness" characterization to the extent it concerned the fruits of petitioner's jailhouse conversations with them. Nevertheless, after viewing the Delaware state courts' denial of these two allegations through the doubly deferential lens applicable on habeas review, the court concludes that the Delaware courts reasonably applied *Strickland* in holding that petitioner was not prejudiced by counsel's failure to pursue a *Massiah* motion concerning Turner and Coleman.

First, with respect to Turner, the record demonstrates that Turner was not acting as a state agent during the time of the challenged conversations and letter writing. She had not entered an agreement to cooperate with the police and was, in fact, facing prosecution on related criminal charges at the time of her testimony. (D.I. 65, April 21, 2003 Tr. Trans. at 180) Although Turner did eventually enter into an agreement with the State of Delaware on May 7, 2002, well after the dates of the challenged conversations, that agreement was "to testify truthfully, if necessary, at trial in [petitioner's case]." (D.I. 20 at Exh. 8) If Turner fulfilled the requirements of the agreement, the State would

make a recommendation to the Commonwealth of Pennsylvania that it resolve her pending case with them with a guilty plea to misdemeanor charges. *Id.* Additionally, petitioner voluntarily and independently sent the 18-page letter outlining his scheme for manufacturing his alibi to Turner; Turner did not initiate the scheme or letter, she did not ask petitioner to send her such a letter, and she did not voluntarily provide the letter to the police. Given these circumstances, there was no reason for counsel to believe a *Massiah* motion based on Turner's communications, or fruits of these communications, would have been successful. Accordingly, counsel did not render ineffective assistance by failing to pursue a meritless *Massiah* motion.

Second, with respect to Coleman, "the use of an informant – even surreptitiously and through prior arrangement – does not violate the Sixth Amendment [under *Massiah*] so long as the informant merely listens to and reports the incriminating statements, rather than affirmatively seeking to induce them." *Matteo*,171 F.3d at 896. The "primary concern" of the *Massiah* doctrine is to proscribe "secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." *Kuhlmann*, 477 U.S. at 277. Here, the record suggests that Coleman's conduct did not approach the level of deliberate elicitation needed to violate *Massiah*. For instance, petitioner asked Coleman to go to the Extended Stay Hotel with Turner in order to meet with the "maintenance man." Coleman did not suggest that she should accompany Turner or suggest that she should become involved in the scheme at all. Additionally, Coleman's involvement in the scheme was limited to merely listening and watching the scheme unfold; it was Turner who spoke to the "maintenance man" about petitioner's

27

proposed alibi scheme. (D.I. 65, Apr. 22, 2003 Tr. Trans. 4/22/2003, at 81-85; Tr. Trans. 4/21/2003 at 137-148). And finally, Coleman did not agree to cooperate with the police in their investigation of petitioner's attempt to falsify an alibi until after petitioner specifically asked for Coleman's help. (D.I. 65, Tr. Trans. 4/22/2003, at 81) Given these circumstances, it was unlikely that a *Massiah* claim based on Coleman's conversations would have been successful, and petitioner cannot demonstrate prejudice stemming from counsel's failure to pursue a baseless *Massiah* claim.

Additionally, as noted by the State, Coleman's testimony regarding petitioner's scheme to manufacture an alibi was cumulative to Turner's admissible testimony regarding the same scheme. Thus, petitioner cannot demonstrate prejudice stemming from counsel's action, because this "manufactured alibi" evidence would have been properly before the jury even if counsel had pursued a *Massiah* motion for Coleman's conversations. *See, e.g., United States v. Drosten*, 819 F.2d 1067, 1072 (11th Cir. 1987); *Williams v. Beck*, 2009 WL 4114709, at *10 (W.D.N.C. Nov. 23, 2009). Accordingly, the court concludes that the Delaware state courts' denial of claim four(a) does not warrant relief.

## C. Claim Four(b): Due Process Violation from Consciousness of Guilt Evidence

In the second part of claim four, petitioner contends that he was denied a fair trial by the admission of the "consciousness of guilt" evidence, namely, the evidence of his attempt to manufacture an alibi. (D.I. 21 at 2) He appears to contend that this admission permitted the State to include in its closing argument the improper "consciousness of guilt theory." To the extent petitioner is presenting a free-standing

28

*Massiah* claim based on the testimony about his attempt to manufacture an alibi, he did not present such a claim to the Delaware Supreme Court on direct or post-conviction appeal.[3] In turn, to the extent he is attempting to assert prosecutorial misconduct for including this information at closing argument, petitioner also did not present this argument on direct or post-conviction appeal. Thus, he has failed to exhaust state remedies for claim four(b).

At this juncture, if petitioner attempted to obtain further review of the instant argument by filing a new Rule 61 motion, the motion would be time-barred under Rule 61(i)(1), barred for being repetitive under Rule 61(i)(2), and procedurally defaulted under Rule 61(i)(3). In these circumstances, the claim must be treated as procedurally defaulted, thereby precluding habeas review absent a showing of cause and prejudice.

Petitioner does not assert cause for his default. In the absence of cause, the court will not address the issue of prejudice. In addition, the miscarriage of justice exception to the procedural default doctrine is inapplicable, because petitioner has failed to provide new reliable evidence of his actual innocence. Accordingly, the court will deny claim four(b) as procedurally barred.

## D. Claim Five: Prosecutorial Misconduct

In this case, the prosecutors sought a jury instruction on accomplice liability, arguing that Daniels had been, or could have been, acting at petitioner's direction when he (Daniels) shot Griffith. The trial judge denied the request, finding no evidentiary basis upon which the jury could rely to infer that petitioner directed Daniels to shoot

---

[3] On post-conviction appeal, petitioner's *Massiah* arguments were presented as ineffective assistance of counsel claims.

Griffith. Nevertheless, during summation the prosecutor informed the jury that under

Delaware law petitioner could be found culpable for the acts of his accomplice Daniels if

the jury found that petitioner had direct Daniels to shoot Griffith. Defense counsel

objected and, in response, the trial judge gave the following curative instruction before

defense counsel made his closing remarks:

> []Ladies and gentlemen, you heard argument by the State that the defendant was responsible for any actions by Mr. Daniels that resulted in the death of Mr. Griffith. The State also pointed to certain facts that were allegedly brought out at trial.
>
> Ladies and gentleman, argument of counsel in opening or closing statements is just that. It is not evidence nor should you consider it as such. You are the judges of the facts, not me or the attorneys. You must determine what took place in this case. Therefore, the States' view of any facts and/or the relationships is not determinative, only yours is.
>
> Further, I instruct you as a matter of law that you may not hold [petitioner] responsible for the actions of Mr. Daniels. You may only consider the evidence in the record as to [petitioner's ] activities in determining whether he is guilty or not guilty as charged and may not impute anything done by Mr. Daniels to [the defendant] in that regard. Do you understand?

(D.I. 65, Tr. Trans. 4/24/04 at 104-105)

On direct appeal, the Delaware Supreme Court determined that the prosecutor's

"blatant refusal to abide by a critical ruling by a trial judge on the law constitute[d]

misconduct." *Price*, 858 A.2d at 939. Applying Delaware law, the Delaware Supreme

Court then proceeded to analyze four factors to determine if the prosecutorial

misconduct required reversal of petitioner's conviction: the closeness of the case; the

centrality of the issue affected by the error; the steps taken to mitigate any prejudice;

and whether the prosecutor's statements were repetitive errors that require reversal

because they adversely affected the integrity of the judicial process. First, the Delaware

Supreme Court found that this was not a close case, citing the corroborative physical evidence and the testimony of numerous witnesses. The State Supreme Court specifically noted the consistent testimony of the two eyewitnesses to the shooting and the consciousness of guilt evidence. Second, because the medical examiner testified that all of the gunshot wounds together caused the death of Griffith, the jury only needed to find that petitioner shot Griffith once in order to conclude that he was guilty. As a result, the Delaware Supreme Court determined that the issue was not central to the case. Third, the State Supreme Court found that the trial judge's curative instruction sufficiently mitigated any unfair prejudice to petitioner. At this juncture, before reaching the fourth step of the analysis, the Delaware Supreme Court concluded that "the prosecutor's conduct, although inexcusable and regrettable, did not so compromise the integrity of the judicial process that petitioner did not receive a fair trial." *Id.* at 940. It was only after reaching this conclusion that the Delaware Supreme Court addressed the fourth step and strongly admonished the prosecutor's "repetitive" behavior,[4] ultimately referring that particular matter to the Attorney General to take appropriate measures against the prosecutor. The Delaware Supreme Court then affirmed petitioner's conviction.

---

[4] The Delaware Supreme Court explained that this particular prosecutor had recently been at the center of a recent appeal highlighting her serious failures to comply with the rules of discovery in a drug case. *Price*, 858 A.2d at 941. In other words, the prosecutor had engaged in a "persistent pattern of misconduct." *Id.* However, the State Supreme Court opined that reversing a conviction should not be the remedy or punishment for a "blundering prosecutor." *Id.* Rather, "where, as here, we can fairly conclude the unfair prejudice caused by such a prosecutor did not adversely affect the outcome of a trial and did not reflect a pattern of conduct that compromises the integrity of the judicial process, we must find other ways to address the prosecutor's misconduct." *Id.*

In claim five, petitioner alleges that the prosecutor's closing argument regarding accomplice liability amounted to prosecutorial misconduct and, therefore, violated his due process rights. Petitioner presented this same argument on direct appeal, and the Delaware Supreme Court denied the claim as meritless. Therefore, claim five will only warrant relief if the Delaware Supreme Court's decision was contrary to, and an unreasonable application of, clearly established federal law.

In order for a prosecutorial misconduct claim to warrant federal habeas relief, the prosecutor's comments must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 180 (1986)(citing *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). A prosecutorial misconduct claim must be examined in "light of the record as a whole" in order to determine whether the conduct "had a substantial and injurious effect or influence" on the jury's verdict. *Brecht v. Abramson*, 507 U.S. 619, 638 (1993). In the Third Circuit, this inquiry involves examining "the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton*, 255 F.3d 95 (3d Cir. 2001).

Here, although the Delaware Supreme court did not cite federal constitutional law during its analysis of petitioner's prosecutorial misconduct claim, its focus on whether the prosecutor's conduct adversely affected the integrity of the judicial process mirrors the inquiry required by *Donnelly* and its progeny. Thus, the Delaware Supreme Court's decision was not contrary to clearly established federal law.

The court also concludes that the Delaware Supreme Court's decision involved a reasonable application of clearly established federal law. First, the Delaware Supreme Court properly examined the prosecutor's comments in the context of the entire trial, including the trial court's proper jury instructions. Second, any prejudice from prosecutor's improper accomplice liability statements were cured by the Superior Court's instructions to the jury that petitioner could not be found responsible for Daniels' actions, and that the jury was to consider petitioner's guilt wholly independent of Daniel's guilt. Third, the evidence of petitioner's guilt was overwhelming. Petitioner and Daniels shot the victim to death in the presence of two eyewitnesses whose testimony, if believed, conclusively established petitioner's guilt. Ballistics tests and the testimony of other witnesses who knew petitioner established that the two weapons used to shoot the victim were consistent with the two handguns petitioner owned, a .25 caliber Derringer and a .45 caliber Glock. Trial testimony established that petitioner was angry with the victim's failure to pay off a substantial drug-related debt, thus providing a motive for the killing. Finally, after his arrest for murder, petitioner made attempts to recruit alibi witnesses, thus showing consciousness of guilt.

After viewing all of these factors in context with the entire trial, the court concludes that the Delaware Supreme Court reasonably applied clearly established federal law in concluding that the prosecutor's comments did not so infect the trial unfairness so as to constitute a denial of due process. Accordingly, the court will deny claim five.

33

## E. Claim Six: Constructive Amendment of Indictment

In claim six, petitioner contends that the "invalid/unconstitutional theories in grounds four and five above, in effect, amount to a constructive amendment of the indictment, which is a violation of the Fifth Amendment Jury Clause." In essence, petitioner is arguing that the indictment was constructively amended by admitting the consciousness of guilt evidence and the prosecutor's improper reference to accomplice liability during closing argument. Petitioner did not present this claim to the Delaware Supreme Court on direct or post-conviction appeal. At this point, the claim would be untimely and procedurally defaulted under Delaware Superior Court Criminal Rules 61(i)(1) and (3). Thus, the court must treat the claim as technically exhausted but procedurally defaulted, thereby precluding review on the merits absent a showing of cause and prejudice.

Petitioner does not allege cause, which obviates the court's need to address prejudice. In turn, the miscarriage of justice exception does not apply, because petitioner has not provided new reliable evidence of his actual innocence. Accordingly, the court will deny claim six as procedurally barred.

## F. Claim Seven: Post-conviction Proceedings Violated Petitioner's Due Process And Equal Protection Rights

In his seventh claim, petitioner contends that the Delaware Supreme Court's summary affirmance of his post-conviction appeal violated his right to equal protection and due process. He complains that the State Supreme Court failed to give a thorough and comprehensive review and analysis of his *Massiah* claims. The court concludes that this claim alleges a state law claim that is not cognizable on federal habeas relief,

34

because petitioner's ultimate criticism is with the Delaware State Courts' analysis in a state collateral proceeding. *See Hassine v. Zimmerman*, 160 F.3d 941, 954 (3d Cir. 1998)(holding that the "federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's **collateral** proceeding does not enter into the habeas proceeding.")(emphasis in original); *see also Lambert v. Blackwell*, 387 F.3d 210, 247 (3d Cir. 2004)("alleged errors in [state] collateral proceedings . . . are not a proper basis for habeas relief"). Therefore, the court will deny claim seven for failing to assert a proper basis for federal habeas relief.

## G. Claim Eight: Cumulative Error

In his final claim, petitioner asserts that the multiple errors alleged in his habeas application, if accumulated, resulted in an unfair trial. This claim is procedurally defaulted because petitioner did not present a "cumulative error" argument to the Delaware Supreme Court on direct or post-conviction appeal, and Delaware court procedural rules would bar him from presenting such a claim at this juncture. Petitioner does not assert any cause or prejudice and, on its face, the cumulative error claim does not point to any new evidence of his actual innocence. Thus, the court will deny claim eight as procedurally barred.[5]

---

[5] Additionally, because the court has concluded that none of petitioner's claims have merit, petitioner's argument that the accumulation of these "errors" warrants relief is similarly meritless. Therefore, if claim eight is somehow not procedurally barred, the court alternatively denies it as meritless.

35

## V. PENDING MOTIONS

During the pendency of this proceeding, petitioner filed a combined motion asking the court to order the withdrawal of his attorney and to grant him permission to file a pro se traverse. (D.I. 89) Soon thereafter, petitioner filed a pro se traverse and supplemental traverse (D.I. 91; D.I. 97), and counsel filed his own motion asking for permission to withdraw from representing petitioner. (D.I. 95)

The court has already granted the motion for withdrawal of counsel. (D.I. 98) Considering that petitioner has already filed a pro se traverse and supplemental traverse, the court will deny petitioner's remaining request to file a traverse as moot. (D.I. 89)

Earlier in this proceeding, petitioner filed motion to supplement his application with a request that the court conduct a harmless error analysis for his *Massiah* claims. (D.I. 50) The court denied the motion as moot, because petitioner had contemporaneously filed his supplement. (D.I. 61) Recently, petitioner filed a motion asking to withdraw his previous request for a harmless error analysis. (D.I. 96) The court will grant the motion. (D.I. 96)

And finally, although petitioner did not file an independent motion for an evidentiary hearing, his application and amended application assert repeated requests for the court to conduct one. For the reasons discussed above, the Delaware state court record and voluminous filings by petitioner conclusively show that he is not entitled to relief. Therefore, an evidentiary hearing is unnecessary.

36

## VI.  CERTIFICATE OF APPEALABILITY

Finally, the court must decide whether to issue a certificate of appealabilty.  *See*

3d Cir. L.A.R. 22.2 (2011).  The court may issue a certificate of appealability only when

a petitioner makes a "substantial showing of the denial of a constitutional right."  28

U.S.C. § 2253(c)(2).  This showing is satisfied when the petitioner demonstrates "that

reasonable jurists would find the district court's assessment of the denial of a

constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Further, when a federal court denies a habeas application on procedural grounds

without reaching the underlying constitutional claim, the prisoner must demonstrate that

jurists of reason would find it debatable: (1) whether the application states a valid claim

of the denial of a constitutional right; and (2) whether the court was correct in its

procedural ruling.  *Slack*, 529 U.S. at 484.

For the reasons stated above, the court concludes that petitioner's habeas

application must be denied.  Reasonable jurists would not find this conclusion

debatable.  Consequently, petitioner has failed to make a substantial showing of the

denial of a constitutional right, and a certificate of appealability will not be issued.

## VII.  CONCLUSION

For foregoing reasons, the court will deny petitioner's application for habeas relief

filed pursuant to 28 U.S.C. § 2254 without an evidentiary hearing.  An appropriate order

will be entered.